**UNITED STATES of America,**

v.

**William AYERS.**

**No. 95 CR 131.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 30, 1997.

Kenyatta Latricia Tatum, Federal Defender Program, Chicago, IL, for defendant.

Jonathan C. Bunge, U.S. Atty. Office, Chicago, IL, for plaintiff.

*MEMORANDUM OPINION AND ORDER*

ANN CLAIRE WILLIAMS, District Judge.

On February 27, 1995, Defendant William Ayers robbed a bank in Chicago. Minutes later, he was apprehended and arrested. Ayers later pleaded guilty to one count of bank robbery in violation of 18 U.S.C. § 2113(a). He now moves for a downward departure in his sentence on the ground that he suffered extreme abuse as a child that affected his later behavior. The court has struggled to rule on Ayers' motion in a manner that is fair to him and consistent with the law. In two prior orders, the court declined to depart downward. After evaluating recent developments in the law, considering further argument from counsel, and hearing testimony from Ayers' wife and sister, the court has decided to depart downward. This

memorandum opinion and order supersedes the court's two prior orders.

### Background

Dr. David M. Randall has prepared a lengthy Sentencing Memorandum on William Ayers, based primarily on conversations with Ayers, his wife, and his sister. Dr. Randall reports that Ayers' early childhood was chaotic and confused. Ayers' parents fought continuously. His father often beat his mother in front of the children. The family moved many times, and Ayers attended five different grammar schools. In school Ayers was diagnosed with learning disabilities. (Randall Mem. at 3–5.) Asked about this period of his life, Ayers told Dr. Randall, "I had special reading classes in school. Went to several different schools, lots of moving around, don't know why." (Randall Mem. at 4.)

When Ayers was about nine years old, his parents separated and his mother moved away to New Jersey. From that age until the age of sixteen, Ayers lived with his father for significant periods of time. Although his father had money, he spent it on his girlfriends instead of his children. In fact, his father was neglectful, cruel, and abusive. He would leave home for days at a time. He would return home and kick his children out of the house, forcing them to sleep in a park. He beat his children. He would refuse to buy food and refuse to give the children money for food. Around this time, Ayers started stealing food for himself and his siblings. On occasion the children could not go to school because their clothes were in tatters. (Randall Mem. at 5–8.) Speaking of his father, Ayers told Dr. Randall,

> He was not a good father, he didn't do fatherly things. He hit me. His hands, on the face, he's always bust my nose, always have a nose bleed. For things like not taking out the trash, and not going to school.

(Ayers at 6.) Ayers left home when he was sixteen years old. (Ayers at 10.)

Dr. Randall reports on Ayers' life from the time Ayers left home until he robbed a bank in Chicago on February 27, 1995. Dr. Randall discusses Ayers' criminal history, drug use, and marriage in some detail. Although Ayers' drug use and deep-seated fear of losing his wife sometimes interfered with their relationship, Ayers' wife portrayed Ayers as a loving husband who was kind and generous to his wife's children by a prior marriage. (Randall Mem. at 11–12.) She told Dr. Randall,

> Billy wouldn't hurt a fly. He's confused. He loves people. He gave his coat to one of his friends because he was cold. Billy said, "I don't care, I'll make it." He wouldn't hurt nobody. He's not that type of person.

(Randall Mem. at 14.) According to Dr. Randall, Ayers' father died in 1994. The funeral was a traumatic time for Ayers, and it evoked many painful, conflicting emotions. (Randall Mem. at 13.)

The week preceding the bank robbery on February 27, 1995 was stressful for Ayers. On February 21, 1995, Ayers was in a car accident, caused by his drinking too much and driving too fast in a snowstorm. The accident apparently damaged the car, which was not insured. Although Ayers refused to go to the hospital, he stated that he had a head injury and suffered from dizziness and headaches for about a week. In addition, Ayers' wife was hospitalized with a very serious case of pneumonia. When Ayers visited his wife in the hospital, he admitted to her that "he was using drugs again." (Randall Mem. at 13.) When Ayers' wife learned that Ayers had robbed a bank, she said she "couldn't believe it." She told Dr. Randall,

> I was shocked, hurt, mad, it was confusing.... I never would figure he'd do something like that. But he was on drugs at that time, heavily, smoking cocaine. He had started doing things around the house he shouldn't have done, like selling possessions around the house. He definitely had a problem.

(Randall Mem. at 14.)

While the court based its initial ruling on Dr. Randall's Sentencing Memorandum, the court has since heard the testimony of Ayers' sister, which the court found completely credible and emotionally devastating. This testimony not only confirmed the accounts of

Ayers' childhood offered by Dr. Randall and defense counsel, but also brought home to the court in vivid detail the hellish childhood that Ayers' endured and the long-term consequences of that tragic experience. For example, Ayers' sister stated that her father beat his children so severely that they were afraid to go to sleep at night: One child would try to sleep while the other stood guard, knowing that at any moment their father might burst into their room and begin beating them. In an effort to protect himself from his father's rage, Ayers sometimes slept under the bed. On many occasions, Ayers' father brought strangers into the house at night, and apparently invited them to physically and sexually abuse his children. Ayers' other (younger) sister suffered from epilepsy; and when she would have seizures, Ayers' father and his friends would beat her. On one occasion, they set Ayers' older sister on fire. (Tr. at 7–9, 5.)[1]

Ayers' father owned a successful taxi cab company and had a lot of money. Yet he forced his children to live like beggars and thieves. While he kept a space heater in his own room, he refused to heat the rest of the house, leaving his children to huddle under blankets while ice formed on the walls. There was no gas or electricity, and Ayers' father once beat his son for turning on the electricity illegally. Ayers' father completely neglected Ayers' younger sister, refusing to provide money for diapers or milk. Sometimes Ayers' father would send his son to the store to buy a steak or some ice cream, and then eat the food in front of his hungry children, watching them beg in vain for a bite to eat. When Ayers' sister got a job to support her brother and sister, her father forced her to quit. To keep from starving, Ayers' sister would steal food or send Ayers out to steal food. They "stole food off a neighbor's grill for the 4th of July." To this day, Ayers' sister blames herself for Ayers' criminal behavior. (Tr. at 7, 9–10, 4–6.)

Trying to come to terms with the childhood she and her brother experienced, Ayers' sister stated:

It's hard for me to come and speak out. It's too embarrassing. Certain people that's built like [my father's friends], we all afraid of them when you see them when you walking down the street because you think it might be them. It's hard for you to trust people. Just make you real overprotective of your kids. It hurts a lot. And they still out there walking around knowing they did this to us. My father married one of them. It's hard. We were not bad kids. We were good kids.

. . . .

My kids wanted to come today, but I was too embarrassed to let them hear this. It's hard. . . . It's hard. It's hard what they did to us. I try not to think about it. I'm mad at my brother for telling. We never told. We been through a lot. We been through a lot. We begged my father to kill us. We been through a lot. We been through a lot. You only a kid and people do this. . . . I'm only 38, but I feel like I'm a hundred. We been through a lot.

We've been through a lot, and my brother, I guess, he blame hisself. You know, he always just had low self-esteem, and he just blame hisself for what we went through.

(Tr. 7–10.)

### Analysis

Under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), a district court may depart from the otherwise applicable Guidelines range it the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 1995 U.S.S.G. § 5K2.0. With certain exceptions, the Sentencing Commission did "not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines,

---

1. "Tr." stands for the transcript of proceedings in this case on April 25, 1997. In several instances, the statement of Ayers' counsel provides useful context for the testimony of Ayers' sister

or additional details that the court finds entirely credible. In these instances, the court cites both Ayers' sister's testimony and Ayers' counsel's statement.

that could constitute grounds for departure in an unusual case." 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

 As the Supreme Court recently explained, the Sentencing Commission "provides considerable guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors as either encouraged or discouraged bases for departure." *Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). Childhood abuse is a discouraged factor. *United States v. Pullen,* 89 F.3d 368, 371 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 706, 136 L.Ed.2d 627 (1997). A court should depart from the Guidelines on the basis of a discouraged factor such as childhood abuse "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon,* —— U.S. at ——, 116 S.Ct. at 2045.

 In this case, the court finds that the childhood abuse Ayers suffered was exceptionally cruel. In and of itself, the physical and sexual abuse that Ayers endured was extreme but not extraordinary: Many defendants that have appeared before this court over the years were beaten and sexually abused as children. What makes Ayers' case exceptional in the eyes of this court is the psychological and emotional abuse that Ayers' father relentlessly inflicted on Ayers over a period of years. This psychological and emotional abuse was a form of sadistic torture.[2] Unlike other defendants this court has sentenced in the past, many of whom suffered some form of physical or sexual abuse, Ayers has survived not only physical and sexual abuse but also psychological and emotional torture that has contributed in a significant way to Ayers' criminal behavior. On this basis, the court grants Ayers' motion to depart downward.

 In its initial response to Ayers' motion for a downward departure, the government argued that Section 5H1.12 of the Guidelines precludes a downward departure

in this case. Section 5H1.12 states that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range." However, the Seventh Circuit recently observed that "the 'similar circumstances' to which section 5H1.12 refers might not be thought to encompass childhood sexual abuse by a parent, which is not all that similar to the sort of parental neglect, rather than abuse, conjured up by the term 'lack of guidance.'" *United States v. Pullen,* 89 F.3d 368, 371 (7th Cir.1996). In light of this observation, this court finds that the "similar circumstances" to which section 5H1.12 refers do not encompass the extreme psychological and physical abuse which Ayers suffered as a child. Therefore, Section 5H1.12 of the Guidelines does not preclude a downward departure in this case.

In a more recent response to Ayers' motion to depart downward, the government likens the facts of this case to the facts of *United States v. Pullen,* 89 F.3d 368 (7th Cir.1996). In *Pullen,*

> The defendant's father was a drunkard and a gambler. He beat his wife and children and threatened them with guns and knives. When the defendant was five years old, his father abused him sexually over a period of several months. His parents divorced and the defendant lived with his mother, but when he was 15, and drinking, smoking marijuana, and having scrapes with the law, his mother could no longer control him and the juvenile court sent him to live with his father. The two would go out drinking together and once after a bout of drinking his father raped him. He ran away. His troubles with the law escalated.

*Pullen,* 89 F.3d at 369. The district judge decided not to depart downward on these grounds, and the Seventh Circuit held that this decision was not an abuse of discretion. The Seventh Circuit went on to state in dicta that "[t]o grant a downward departure in these circumstances would have been an abuse of discretion." *Id.* at 372.

---

**2.** According to *Black's Law Dictionary* (5th ed., 1979), to torture a person is "[t]o inflict intense pain to body or mind for purposes of punishment, or to extract a confession or information, or for sadistic purposes."

This case is more extreme than *Pullen.* Like the defendant in *Pullen,* Ayers' survived both physical and sexual abuse. Unlike the defendant in *Pullen,* however, Ayers also survived a kind of psychological and emotional torture that this court has never before seen. The severity of the abuse that Ayers suffered makes his case less like *Pullen* and more like *United States v. Roe,* 976 F.2d 1216 (9th Cir.1992). In *Roe,*

> The record indicat[ed] [that Roe's] mother's boyfriend savagely beat Roe, sometimes as often as once a day, with belts, extension cords, and coat hangers. He also routinely raped and sodomized her. When Roe resisted, she was stripped naked and beaten into submission. On at least one occasion, he forced Roe to lay naked on the basement steps while he urinated in her mouth.

*Id.* at 1218. Based on this record, the court departed downward from the guidelines range. Although the physical abuse that Ayers' suffered may not have equalled that suffered by Roe, the psychological abuse that Ayers' suffered appears to have been much worse. In any event, the court finds that Ayers' experience of abuse, like Roe's experience, and unlike Pullen's experience, is so extreme and exceptional that it justifies a downward departure in this case.

### Conclusion

For reasons stated above, the court grants Ayers' motion for a downward departure. Absent a downward departure, Ayers offense level would be 29 and his criminal history category would be VI, resulting in a guideline range of 151 to 188 months in prison. At the sentencing hearing set for May 30, 1997, the court will hear oral argument on the extent to which the court should depart downward.